UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                Case No. 21-cr-20047
                Hon. DENISE PAGE HOOD

vs.

NICHOLAS DILLON,

        Defendant.
_____/
CHRISTOPHER W. RAWSTHORNE
Assistant United States Attorney
211 W. Fort Street; Suite 2001
Detroit, MI 48226-3220
313-226-9169
Email: christopher.rawsthorne@usdoj.gov

SANFORD A. SCHULMAN
Attorney for Defendant
       NICHOLAS DILLON
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
Email: saschulman@comcast.net
_____/

**DEFENDANT NICHOLAS DILLON's SENTENCING MEMORANDUM**

      NOW COMES the Defendant, NICHOLAS DILLON, by and through his attorney, SANFORD A. SCHULMAN, and states in support of his Sentencing Memorandum as follows:

1

## **INTRODUCTION AND OVERVIEW**

Except for a few driving infractions, Nicholas Dillon has had no prior police contact and has been otherwise a model citizen, caring son, dedicated husband and father and hardworking employee. This case reflects an isolated incident that is overshadowed by everything that Nicholas has done and is assuredly capable of doing in the future.

Mr. Dillon pled guilty to one count of receipt of child pornography with an agreement that the parties recommend a sentence not to exceed the top of the advisory guideline range. Probation calculated the advisory guidelines as 57 to 71 months. However, the statute mandates that this court cannot depart below 60 months.

### A. **Nature and Circumstances of Nicholas Dillon's Offense and His History and Characteristics**

Nicholas Dillon has no criminal history. No misdemeanors. No felonies. No juvenile cases. No police contact except for several moving violations. The presentence report provides a fair and accurate overview of the nature and circumstances of Mr. Dillon and the offense for which he has accepted responsibility. The report, however, notes in paragraph 31 that the offense was unintentional. To clarify, Mr. Dillon meant that the offense began unintentionally and he never fully grasped or understood the consequences.

As part of his plea, Nicholas stated at his change of plea hearing and continues to acknowledge that on or about May 13, 2020 he knowingly received child pornography that was sent to him from an underaged female who resided in

2

the Eastern District of Michigan that she had sent to him during a Snapchat conversation and the image contained the lascivious exhibition of her genitals.

Law enforcement conducted and unannounced search and seized his computers and cellphone. There was no evidence that he had had any physical contact with this minor or any other minors. There is no evidence or that Nicholas is a pedophile. Moreover, there is no evidence that he had any other interaction on the computer or phone with any other minors.

Given that there were four pictures possessed or distributed on May 13, 2020 and June 6, 2020 (a relatively short period of time), the defendant has been assessed a base offense level of 22 points and 4 points for the image conversion with 2 additional points added for the use of a computer.

B.  **Legal Framework**

While this Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). Kimbrough v United States, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50, and explain how the facts relate to the purposes of sentencing. Id. at 53-60; Pepper v. United States, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Id. at 101; Pepper, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101-02 (internal punctuation omitted) (citing Rita v. United States, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in Kimbrough, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Kimbrough, 552 U.S. at 91, 109-10; see also Spears v. United States, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In Vazquez v. United States, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing

sentencing under Section 3553(a)." U.S. Br. at 11, Vazquez v. United States, No. 09-5370 (Nov. 2009). As the Sixth Circuit has previously recognized, "all of the sentencing guidelines are advisory," including those directed by Congress. United States v. Michael, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." Id. at 328.

      C.      **The Sentencing Commission's Report to Congress**

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," id. at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." Id. at ii, 323.

5

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." Id. at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P filesharing." Id. at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." Id. at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" id. at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." Id. at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." Id. at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. Id. at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of

6

sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." Id. at xx; see also id. at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." Id. at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." Id. at xviii-xix, 322-23.

The case at bar is a classic example of an individual who viewed materials that are deemed not only inappropriate but illegal. He did not own a camera and produce any of the materials. He is charged and has accepted responsibility for possessing the materials. A similar case in state court would very likely result in

7

a probationary sentence. Physical contact with minors, of course, significantly elevates and criminalizes such conduct.

### D. Requested Sentence

The defense would urge this court to consider the defendant's lack of criminal history; absence of deviate sexual history, aside from pornography; ability to obtain and sustain employment; self-described feelings of shame and remorse regarding this offense; acceptance of responsibility for this offense; acknowledgment of the harmful results of possessing and viewing child pornography; his intellectual ability to benefit from appropriate and long-term therapeutic intervention; access to supportive family members (See letters attached) who can become allies in behavioral monitoring and recovery; and his willingness to comply with the court's ordered therapeutic intervention.

Unlike the advisory guideline range the requested sentence of probation is "sufficient, but not greater than necessary" to serve sentencing purposes under § 3553(a).

## ARGUMENT

**I. Given the Nature and Circumstances of Mr. Dillon's Offense and His History and Characteristics, the Sentence Requested Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. See S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than

another purpose has." Id. at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). Id. at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." Id.; see also United States v. Bridgewater, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction. Mr. Dillon's offense is less serious than the offenses Congress had in mind, and Mr. Dillon is not the dangerous offender Congress envisioned. Incarceration beyond the 5 years that is mandated is not necessary to protect the public and Mr. Dillon, who is 38 years old with a strong family is a very low risk of further offending. .

    A.    **Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A)**

        1.    <u>Seriousness of the offense</u>

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[1] Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Mr. Dillon has

---

[1] See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); id. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); see also generally Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

not been charged with or suspected or convicted of sexually abusing a child and has not in fact had any in appropriate contact with minors.

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images. See 136 Cong. Rec. S4730 (Apr. 20, 1990). Aside from the evidence that disproves this belief in general, Mr. Dillon did not pay for or trade any images.

In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. See U.S. Sent'g. Comm'n, Report to the Congress: Sex Crimes Against Children 29 (1996) [U.S. Sent'g Comm'n, 1996 Report]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, Use of Guidelines and Specific Offense Characteristics (2011); U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. See Andreas Frei et al., Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne, 135 Swiss Med. Weekly 488, 492 (2005); see also Jérôme Endrass et al., The Consumption of Internet Child Pornography and Violent Sex Offending, 9 BMC Psychiatry 43, 44 (2009); L. Webb et al., Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters, 19 Sexual Abuse 449, 450 (2007). In short, the change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased. See Richard Wollert, PhD, The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in . . . ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated." Child Porn Report at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," id. at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," id. at 322-23, such

11

as those like Mr. Dillon who, for the most part, did not deliberately or discriminatingly select or catalogue their images, id. at 84-92.

The Sixth and Seventh Circuit Court of Appeals have also given examples of factors that in general might justify a sentence increase, for example, fleeing from authorities, failing to accept responsibility, using violence, or having prior convictions for of sex offenses with children. See Aleo, 681 F.3d at 302; Poynter, 495 F.3d at 354. Mr. Dillon's conduct and characteristics could not be farther from these. Nicholas presents low risk of ever harming a child. His family reports that this behavior was not consistent with his character and believes that he will never engage in that kind of behavior again.

One of the goals of the SRA was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography guideline fails that goal, as several courts have noted. See, e.g., United States v. Dorvee, 616 F.3d 174, 187 (2010); United States v. Beiermann, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); Cruikshank, 667 F. Supp. 2d at 702.

Mr. Dillon recognizes the great harm inflicted on the victim depicted in these images and the interaction he had with this minor. He has expressed his willingness to participate in treatment and in doing so, has reached a clear understanding of how others view these images negatively impacts the child victims. (See his letter attached).

2. **Just punishment**

As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. See, e.g., United States v. Garate, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of Gall, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); United States v. Pauley, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after Gall, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," id. § 3553(a)(2)(A), and "adequate deterrence," id. § 3553(a)(2)(B)); United States v. Gardellini, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

Mr. Dillon's reputation, ability to obtain employment and even where he will reside will be directly impacted by this conviction.

13

B. **Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

14

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. See also Part IV.A.3, infra. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." Beiermann, 599 F. Supp. 2d at 1103; id. at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." Child Porn Report at 98.

15

There is a significant disparity between similar cases in state courts and federal court. Had Nicholas Dillon been charged in many states, he would have been eligible for a probationary sentence. He would likely have received it.

C. **Need for Incapacitation**, 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research in general and is unjustified based on the evidence in this case.

In short, Nicholas Dillon's age, strong family support, education and gainful employment and his willingness to participate in cognitive behavioral therapy strongly support the conclusion that he is most unlikely to re-offend. While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Dillon is not one of them. The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case.

II. <u>The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities.</u>

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in

16

characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform 113 (2004).

The guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. .

This court must also consider that Nicholas Dillon is unable to obtain a 5k1.1 motion for a downward departure based on cooperation. Too bad for Nicholas that he has no knowledge or information regarding murders or car jackings or drug activities. He has avoided any criminal activity. But had he possessed the knowledge of criminal activity, he would have been rewarded with the Government recommending a sentence far below the guidelines or the mandatory minimum. Jamie is essentially punished for his lack of criminal experience.

    III.    <u>The Sentence Requested Meets the Purposes of Sentencing Under the Circumstances in this Case and Is Consistent with Recent Sixth Circuit Law.</u>

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a)(3). Congress has provided for a range of sentences but a sentence of at least 5 years is mandated and actually ABOVE the advisory sentencing guidelines.

## **CONCLUSION**

For the reasons stated, Nicholas Dillon respectfully requests a sentence of 60 months and a period of supervised release and a recommendation that any custodial sentence be served near his family in Ohio.  Such a sentence is sufficient but not greater than necessary along with any other terms and conditions deemed appropriate by the probation department for the reasons so stated herein.

Respectfully submitted,

/s/ Sanford A. Schulman
SANFORD A. SCHULMAN
Attorney for Defendant
    NICHOLAS DILLON
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
Email: saschulman@comcast.net

Date:  September 20, 2021